# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:16CR380 CDP (SPM) |
| | ) | |
| ROBERT RENO-1, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION AND ORDER
## OF UNITED STATES MAGISTRATE JUDGE

In accordance with the Memorandum filed herein,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Electronic Surveillance Evidence (Doc. 317) be **DENIED.**

**IT IS FURTHER RECOMMENDED** that Defendant's Motion to Suppress Evidence (Doc. 318) be **DENIED.**

The parties are advised that they have **fourteen (14)** days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. *See Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

Trial in this case has been set before the **Honorable Catherine D. Perry** on **Monday, December 17, 2018, at 8:30 a.m.**

_____
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 7th day of November, 2018.

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:16CR380 CDP (SPM) |
| | ) | |
| ROBERT RENO-1, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

All pretrial motions in the above cause were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. §636(b).

### I.   BACKGROUND AND PROCEDURAL HISTORY

On August 25, 2016, Defendant Robert Reno was charged in an indictment with conspiracy to distribute a mixture or substance containing a detectable amount of methamphetamine, felon in possession of a firearm, and distribution of a mixture or substance containing a detectable amount of methamphetamine. (Doc. 1). The United States subsequently filed a motion to designate the case as complex and to set trial date beyond limits set by the Speedy Trial Act. (Doc. 58). That motion was granted. After several extensions at the request of defendant, the deadline for filing pretrial motions was set for May 4, 2017. On May 4, 2017, in compliance with the Court's deadlines, Defendant Reno (through previously retained counsel) filed a motion to suppress the contents of any and all electronic surveillance evidence (Doc. 134) and a motion to suppress physical evidence (Doc. 135). The undersigned set an evidentiary hearing on Defendant Reno's pretrial motions for May 24, 2017.

However, before the scheduled evidentiary hearing, on May 11, 2017, Defendant Reno's former retained counsel filed a motion for psychiatric examination and a motion for leave to withdraw as counsel for Defendant Reno. Following a hearing held on May 24, 2017, the undersigned granted the motion for

a psychiatric examination, and deferred ruling on counsel's motion to withdraw until after the psychiatric examination. On June 28, 2017, a federal grand jury returned a superseding indictment in which Defendant Reno was charged with conspiracy to distribute 500 grams or more of a mixture or substance containing methamphetamine (Count One), distribution of methamphetamine (Count Two), possession of a firearm in furtherance of a drug trafficking crime (Count Three), felon in possession of a firearm (Count Four), and possession with intent to distribute 500 grams or more of methamphetamine (Count 6). (Doc. 179).

Due to a delay in transportation, Defendant did not arrive at the designated facility for psychiatric evaluation until August 21, 2017. As such, the facility requested an extension through October 27, 2017 to complete the evaluation and submit a report. (Doc. 247). On October 31, 2017, a psychiatric report reflecting the results of the psychiatric examination was submitted; and, on November 9, 2017, the undersigned held a competency hearing, at which it was determined that Defendant was competent to proceed. At the time of the competency hearing, Reno's then-retained counsel was granted leave to withdraw due to conflicts that had arisen between Reno and his attorneys. Reno represented that he was indigent and requested court-appointed counsel. CJA panel attorney Talmadge Newton was appointed and, at Mr. Newton's request, the pretrial motion deadline was extended three times to March 21, 2018.

Mr. Newton withdrew the previously filed pretrial motions and, on March 21, 2018, filed the instant motion to suppress evidence obtained by the United States from court authorized electronic surveillance (Doc. 317) and motion to suppress physical evidence (Doc. 318). Specifically, the motion to suppress physical evidence sought suppression of (i) evidence seized during a traffic stop in Audrain County on March 15, 2015; (ii) records and location information for a cellular telephone registered to Reno obtained via an April 3, 2015 order; (iii) recordings from a monitored pole camera installed on May 20, 2015; (iv) electronic identifying numbers of any cellular telephones used by Reno obtained through a September 8, 2015, search warrant for a cell-site simulator; and (v) evidence seized pursuant to a December 10, 2015 search warrant executed at Defendant's home and a shop address. (Doc. 318). The

United States opposed Defendant's motions (Doc. 322); and the undersigned scheduled an evidentiary hearing for April 30, 2018.

On April 25, 2018, attorney Beau Brindley filed a motion on behalf of Reno requesting that the Court "withdraw" Mr. Newton and "substitute attorney Beau B. Brindley to represent him for the remainder of the case." Because it was unclear whether Mr. Brindley had been retained or was requesting that he be appointed by the Court, the undersigned held a telephone status hearing with the parties on April 27, 2018. During the status hearing, Mr. Brindley clarified that he had been retained by Mr. Reno's family. Based on the discussion held on the record, Mr. Brindley indicated that he would enter his appearance and request a continuance of the evidentiary hearing for a period of thirty (30) days. The undersigned continued the evidentiary hearing to May 31, 2018, and subsequently granted defendant additional time until May 25, 2018, to decide whether to proceed on the existing pretrial motions or to file new motions. On May 22, 2018, defendant requested and was subsequently granted an extension of the pretrial motion deadline to June 4, 2018. The evidentiary hearing was continued to June 20, 2018.

On June 4, 2018, in compliance with this Court's order, defense counsel advised in a written status report that Defendant Reno intended to proceed with the pretrial motions previously filed by court-appointed counsel Talmage Newton. (Doc. 347). Counsel noted in the report that he would be prepared to proceed at the June 20th evidentiary hearing. *Id.* However, the day before the scheduled evidentiary hearing, on June 19th, defense counsel filed a motion to continue the scheduled evidentiary hearing, citing an emergency involving his pet. Due to a number of scheduling conflicts with both the Court's docket and defense counsel's trial schedule, the evidentiary hearing was reset for August 30, 2018.

However, on August 29, 2018, Reno's retained counsel filed an "Agreed Motion to Strike Evidentiary Hearing and Withdraw Motions" (Doc. 358). On August 30, 2018, the Court held a hearing on the "Agreed Motion" to withdraw filed by retained counsel. At the time of the the hearing, Reno was present with retained counsel, Michael Thompson. The United States was represented by Assistant United States Attorney Edward Dowd. Mr. Thompson stated on the record that, after more closely reviewing the

pending pretrial motions, which were filed by Reno's prior court-appointed counsel, the current defense team did not believe the motions are meritorious and did not believe that a hearing on the motions would benefit the defendant.

However, Reno stated on the record that he had not been in contact with his attorneys prior to the hearing and did not agree with the decision to withdraw the pending pretrial motions. Given the apparent lack of communication between defense counsel and the defendant, the undersigned denied the motion to withdraw Reno's pretrial motions, without prejudice, and directed defense counsel to confer with Reno and, if necessary, explain their reasons for withdrawing pretrial motions.

The Court rescheduled the evidentiary hearing for September 12, 2018, and directed defense counsel to notify the Court by no later than September 10, 2018, if defense counsel intended to reassert the motion to withdraw pretrial motions. Shortly after the hearing on August 30, 2018, the Court rescheduled the evidentiary hearing for September 18, 2018, due to a scheduling conflict with one or more government witnesses.

On September 18, 2018, this matter came before the Court for the evidentiary hearing on Reno's pending pretrial motion to suppress electronic surveillance evidence (Doc. 317) and motion to suppress physical evidence (Doc. 318). Reno was present, in custody, and the United States was represented by Assistant United States Attorneys Edward Dowd and Sirena Wissler. Witnesses for the United States also appeared for the hearing. However, neither of Reno's retained attorneys of record—Beau Brindley and Michael Thompson—appeared.

Upon inquiry by the Court, Mr. Reno indicated that he and his family had unsuccessfully attempted to contact his retained attorneys. Mr. Reno further indicated that he had no contact with his counsel since his last appearance before this Court on August 30, 2018. AUSA Dowd also indicated that his office had made multiple attempts to contact counsel and counsel's office, without success. The Court also indicated its lack of success in reaching even a receptionist at the offices of defense counsel. Given the circumstances, as set out on the record in open court, Defendant requested that the Court appoint counsel

- 4 -

to represent him in future proceedings. That request was granted. The undersigned reappointed CJA panel attorney, Talmage Newton to represent Reno and set the case for a status hearing on September 26, 2018.

On September 26, 2018, the undersigned held a status hearing at which Assistant United States Attorney Ed Dowd, Defendant's attorney, Talmage Newton, and Defendant were present. At the status hearing, the Court and counsel discussed Defendant's pretrial motion to suppress electronic surveillance evidence (Doc. 317) and motion to suppress physical evidence (Doc. 318). Based on the discussion held on the record in open court, the undersigned set the matter for an evidentiary hearing on October 5, 2018 at 9:30 AM.

Two days before the scheduled evidentiary hearing, on October 3, 2018, Reno's court-appointed counsel, Talmage Newton filed a motion for leave to withdraw as appointed counsel so that Reno could proceed with his previously retained counsel (Brindley and Thompson). Citing a scheduling conflict for Brindley and Thompson, Newton's motion also sought a continuance of the evidentiary hearing set for October 5, 2018. (Doc. 375). The undersigned denied the motion in a written order entered on October 4th and held the evidentiary hearing as scheduled on October 5, 2018.[1]

At the hearing, the United States conceded that it did not intend to offer any evidence seized from the Audrain County traffic stop. As such, the defense conceded that, to the extent the motion to suppress physical evidence seeks to suppress evidence seized during the Audrain County traffic stop, the motion is moot. The United States also argued, and the defense conceded, that the motion to suppress is moot to the extent it seeks suppression of evidence seized pursuant to a search warrant executed at 117 South Olive, a business investigators believed was associated with Reno. Specifically, Reno denied any ownership interest in, and any association with, the address. As such, Reno denied that he has standing to challenge the search or seizure at that address. Based on the record made at the evidentiary hearing and for the

---

[1] The hearing proceeded subject to Reno's objection to proceeding without his retained counsel. However, for the reasons set out in the undersigned's order dated October 4, 2018 (Doc. 376), I found the objection was not well taken.

reasons set out above, there are no issues for the undersigned to resolve with respect to the Audrain County traffic stop and with respect to the search of, and seizures from, 117 South Olive. As such, this Report and Recommendation will not address those previously challenged searches/seizures relative to the Audrain County traffic stop and the business at 117 South Olive.

The United States offered the testimony of DEA Special Agent Ryan Lawyer and documentary and photographic evidence. Defense counsel cross examined Agent Lawyer but did not present any additional witnesses or exhibits at the evidentiary hearing. I found the testimony of Agent Lawyer to be credible and reliable.

Based upon the evidence adduced at the hearing on the motions to suppress, as well as a review of the rough transcript of the hearing in this matter, and the briefs of the parties, the undersigned makes the following findings of fact and conclusions of law:

## II.    FINDINGS OF FACT

At the time of the evidentiary hearing, Special Agent Ryan Lawyer was a 14-year veteran agent of the Drug Enforcement Administration (DEA), who began his career in law enforcement in 1999. During his time with DEA, Agent Lawyer had a long working relationship with the local drug task force in Audrain County. In the Spring of 2014, the Audrain County drug task force advised Agent Lawyer of Reno and his methamphetamine distribution activities. Lawyer indicated he would be willing to assist them with the case at some point and told them to contact him once they had developed a good confidential source. The Audrain County drug task force developed such a source and contacted Agent Lawyer in February 2015.

### A.    April 3, 2015, PLI Warrant for Records and Precision Location Information from Reno's Cellular Telephone

A review of the Court's own files reveals that, on April 3, 2015, the United States sought and obtained a Warrant and Order for "records and location information, including precision location information, cell site location information, and other signaling information" for a cellular telephone

registered to Defendant Reno (the "PLI Warrant"). The warrant application was supported by an affidavit attested to by Agent Lawyer, which set out in detail the basis for probable cause. Specifically, the information provided in support of a finding of probable cause included information from toll analysis, interviews of confidential sources and other sources of information, and physical surveillance by a task force officer. *See In Re: Application of the United States of America for A Warrant to Obtain Records, Location Information, and Other Signaling Info.,* Case No. 4:15MJ6092PLC Doc. Nos. 1, 1-1 & 2.

### B. September 8, 2015, Cell-Site Warrant Authorizing Use of a Cell-Site Simulator and for Records Related to Reno's Telephones

A review of the Court's own files reveals that on September 8, 2015, the United States sought and obtained a search warrant to use a cell-site simulator to determine the electronic identifying numbers of any cellular telephones used by Reno (the "Cell-Site Warrant"). The warrant application was supported by an affidavit attested to by Agent Lawyer, which set out in detail the basis for probable cause. Specifically, the information provided in support of a finding of probable cause included information from toll analysis, interviews of confidential sources and other sources of information, and Title III intercepts of Reno and other members of the suspected drug trafficking organization. *See In Re: Application of the United States of America for A Warrant to Authorize Use of A Cell-Site Simulator,* Case No. 4:15MJ7252SPM Doc. Nos. 1, 1-1 & 2.

### C. Warrantless Pole Camera (May 2015 & October 2015)

Agent Lawyer testified that during the pendency of the investigation into the Robert Reno drug trafficking organization ("DTO"), investigators used internet-based pole cameras to conduct surveillance of two locations: the business near the 100 block of South Olive in Mexico, Missouri, which they believed was associated with Reno (the "South Olive pole camera") and Reno's residence located at 1311 Ringo, in Mexico, Missouri (the "Ringo pole camera"). Investigators did not obtain a warrant for either camera. The South Olive pole camera was installed on or about May 20, 2015, and operated continuously until on or about December 31, 2015. The South Olive pole camera captured the entire 100 block of South Olive,

including the business located at 117 South Olive that was a target of the investigation. *See* Govt Exh. 27. The area of 117 South Olive captured by the South Olive pole camera appears to have been a purely public area that anyone walking or driving down the street would be able to see. *See id.*

Agents installed the Ringo pole camera on or about October 22, 2015. It was covertly installed on the outside of Reno's next door neighbor's garage with the neighbor's consent. Reno's street appears to be located in a suburban neighborhood where the houses were relatively close to each other. *See* Govt Exh. 28. Reno's house was approximately 50 feet from his neighbor's house, and there appears to have been no visible fence separating Reno's driveway from the neighbor's house. *See id.* The Ringo pole camera was not on a pole at all. It was about a foot or two off the ground and was trained on Reno's driveway. It ran 24 hours a day, and agents had the ability to monitor the feed in real time, rewind, fast forward, and take still shots (although Agent Lawyer testified they never took still shots). The Ringo pole camera remained in place for about six weeks until approximately December 12, 2015.

Although the portion of Reno's driveway captured by the pole camera could also be viewed from the street, the Ringo pole camera captured a view of Reno's driveway from an angle that only someone standing on the neighbor's property would have had. Agents did not encroach on Reno's property to install the Ringo pole camera and the camera did not appear to capture Reno's house at all. Instead, it captured only cars parked on Reno's driveway and the street that ran in front of the house. *See id.*

### D. August 2015 Title III Authorization

The evidence adduced at the evidentiary hearing shows that the United States conducted court ordered electronic surveillance during the investigation of the matters alleged in the indictment. On August 28, 2015, acting on behalf of Special Assistant United States Attorney Edward Dowd, Assistant United States Attorney Stephen R. Casey appeared before United States District Judge Ronnie L. White and made an application for interception of wire communications over telephone number (573) 230-5277, International Mobile Subscriber Identity ("IMSI") 310410505507136 (referred to in the applications, affidavits, and orders as Target Telephone #2). *See* Govt. Exhs. 3, 4 & 5. The application was accompanied

by, and referenced, an affidavit of Agent Lawyer, which was also signed and sworn to before Judge White on August 28, 2015. *See* Govt. Exh. 4.

Agent Lawyer's affidavit established that, at the time he applied for an order authorizing the initial interception of wire and other electronic communications, Reno was the primary target of an investigation into a suspected methamphetamine organization and for violations of various drug trafficking, firearm, money laundering, and other federal laws. The affidavit indicated that Agent Lawyer expected that the communications of the identified individuals, including Reno, would be intercepted on Target Telephone #2, which was subscribed to and used by Reno. The communications expected to be intercepted and sought to be intercepted concerned the details of offenses committed by the subjects of the investigation as well as the nature, extent, and methods of operation of the narcotic distribution of the target subjects and others yet unknown; the identities and roles of accomplices, aiders and abettors, co-conspirators, and participants in their illegal activities; the distribution and transfer of the contraband and money involved in those activities; the existence and location of records pertaining to those activities; the location and sources of resources used to finance the suspects' illegal activities; the location and disposition of proceeds from the suspects' illegal activities; and the locations of items used in furtherance of the suspects' illegal activities.

The affidavit sets out that in March 2014, DEA St. Louis conducted two separate controlled purchases of crystal methamphetamine from an individual in Vandalia, Missouri, who was eventually arrested. As a result of that individual's cooperation and the subsequent cooperation of other sources of information, investigators were ultimately able to identify Reno as a significant methamphetamine distributor in the Mexico, Missouri area. Through the use of a variety of investigative techniques—all detailed in the affidavit—including review of police reports and records; analysis of phone toll records; air time summaries; pen register data; Title III intercepts on a different phone (Target Telephone #1); law enforcement surveillance; intelligence and proactive efforts from cooperating sources of information, cooperating defendants, and confidential sources--investigators concluded that conversations and other communication between the targets identified in the affidavit, including Reno, and others yet unknown

would be obtained through the interception of wire and electronic communications over Target Telephone #2.

The affidavit set out in detail the investigative tools and methods used in the investigation to date, including visual surveillance, pen registers, telephone toll records analysis, witness interviews, confidential informants, undercover officers, search warrants and trash pulls, interviews with target witnesses and use of grand jury proceedings, review of police records, use of electronic surveillance cellular location data, tracking devices and Title III intercepts of Target Telephone #1. *See* Govt. Exh. 4, ¶¶ 76-114. The affidavit recited in detail how each of the investigative tools had been used in the investigation and why each tool had not been successful or was unlikely to be successful. *Id.* Agent Lawyer's hearing testimony, which was not disputed by defendant, both confirmed and elaborated on the information contained in the affidavit regarding the investigative team's use and consideration of alternative investigative tools.

On August 28, 2015, Judge White signed an Order authorizing the interception of wire communications of Target Telephone #2. *See* Govt. Exh. 5. The Order states that the Court found probable cause to believe that the listed individuals were committing violations of 21 U.S.C. §§ 841(a)(1), 843(b), 846 and 18 U.S.C. §§924(c), 1956 & 1957 and that communications concerning the offenses were likely to be intercepted. The Order further found that normal investigative techniques had been tried and had failed, reasonably appeared to be unlikely to succeed if tried, or were too dangerous to be employed. The order authorized the wiretap interception for thirty (30) days.

The evidence presented at the hearing reflected that safeguards were put in place with respect to minimization. On the same date the wiretap was authorized, August 28, 2015, Agent Lawyer and his fellow investigators met with the prosecutor and discussed the appropriate restrictions and minimization techniques to be used on a Title III case. Agent Lawyer and his colleagues signed the letter and took steps throughout the investigation to adhere to the restrictions set out in the Court's order and in the minimization letter. *See* Govt. Exh. 6. In addition, Agent Lawyer's testimony and related ten-day reports

reflect that the investigating agents' wiretap activities were monitored by district judges who reviewed the ten-day reports including the intercepts the subject matter being intercepted, and the type of minimization occurring throughout the case. *See* Govt. Exhs. 7, 8, 9, 13, 14, 15, 19, 20 & 21.

On September 25, 2015, Special Assistant United States Attorney Edward Dowd appeared before United States District Judge Rodney W. Sippel and made an Application for Continued Interception of Wire Communication over Target Telephone #2. *See* Govt. Exh. 10. The application was again accompanied by and referenced an affidavit of Special Agent Lawyer. *See* Govt. Exh. 11. The affidavit set out information learned by investigators since the first application, including some of the information learned as a result of the first 30-day interception period. The affidavit noted that the information learned during the first interception had been helpful but did not reveal the entire scope of the organization, its activities, and/or its members, including higher level members. *See id.*

On September 25, 2015, Judge Sippel signed an Order Authorizing the Continued Interception of Wire Communications over Target Telephone #2. *See* Govt. Exh. 12. The Order states the Court found probable cause to believe that the listed individuals were committing violations of 21 U.S.C. §§ 841(a)(1), 843(b), 846 and 18 U.S.C. §§924(c), 1956 & 1957 and that communications concerning the offenses were likely to be intercepted. The order further found that normal investigative techniques had been tried and had failed, reasonably appeared to be unlikely to succeed if tried, or were too dangerous to be employed. The order authorized the continued wiretap interception for thirty (30) days.

On October 23, 2015, Special Assistant United States Attorney Edward Dowd appeared before United States District Judge Audrey G. Fleissig and made a second Application for Continued Interception of Wire Communication over Target Telephone #2. *See* Govt. Exh. 16. The application was again accompanied by and referenced an affidavit of Special Agent Lawyer. *See* Govt. Exh. 17. The affidavit reiterated and incorporated the information set out in Agent Lawyer's previous affidavits accompanying the first and second applications. The affidavit further set out some of the information learned as a result of the second 30-day interception period. The affidavit noted that the information learned during the first

and second interceptions had been helpful but had not revealed the entire scope of the organization, its activities and/or its members. *See id.*

On October 23, 2015, Judge Fleissig signed an Order Authorizing the Continued Interception of Wire Communications over Target Telephone #2. *See* Govt. Exh. 18. The Order states the Court found probable cause to believe that the listed individuals were committing violations of 21 U.S.C. §§ 841(a)(1), 843(b), 846 and 18 U.S.C. §§924(c), 1956 & 1957 and that communications concerning the offenses were likely to be intercepted. The order once again found that normal investigative techniques had been tried and had failed; reasonably appeared to be unlikely to succeed if tried; or were too dangerous to be employed. The order authorized the continued wiretap interception for thirty (30) days.

**E. December 10, 2015, Search Warrant**

On December 10, 2015, Agent Lawyer appeared before United States Magistrate Judge Thomas C. Mummert and applied for search warrants for 1311 Ringo Street in Mexico, Missouri (Govt. Exh. 1) and 117 South Olive in Mexico, Missouri (Govt. Exh. 2). Each search warrant application was accompanied by and referenced an affidavit by Agent Lawyer. The affidavit indicated that the search warrant application was made in connection with the DEA's ongoing investigation into the Robert Reno drug trafficking organization which, as referenced above, began sometime in March 2014. The affidavit stated that the DEA's long-term investigation of the Reno DTO was concluding and explained that the investigation had involved interviews of numerous cooperating individuals, confidential sources, controlled drug purchases, extensive surveillance, and Title III intercepts of telephones used by Reno and another member of the DTO.

The affidavit attests that 1311 Ringo is Reno's residence and sets out corroborating information investigators obtained from utilities and local government offices that link Reno to the residence. The affidavit details the investigation to date and sets out the investigators' collective belief that Reno is a major distributor of methamphetamines in Mexico, Missouri. The affidavit also described information provided from a confidential source ("CS") who was familiar with Reno and was able to provide

- 12 -

significant details about his operations. The affidavit also provides information from a second CS indicating that one of the locations targeted in the affidavit (location #2) was a shop utilized by Reno for drug trafficking activities, although it was registered in someone else's name. *See* Govt. Exh. 2, at ¶60. The affidavit further describes information from a concerned citizen; a source of information; a co-conspirator (Josh Evans) and additional sources of information. The affidavit also details intercepted communications between Reno and others that, coupled with physical surveillance, indicated to investigators that methamphetamine was being stored, weighed, and repackaged (for distribution) at Reno's residence and that evidence of Reno's drug trafficking activities would be found there.

The search warrant details Agent Lawyer's experience and credentials, which include his participation in over 500 controlled substances investigations involving the use of confidential informants, Title III intercepts, and the execution of arrest and search warrants. Govt. Ex. 2, at ¶ 2. The affidavit further outlines the background of the confidential sources referenced in the affidavit. Govt. Exh. 2, at ¶¶ 8-11 & 17-26. It also describes past criminal activity by the confidential sources and describes how the investigative team corroborated information provided by the confidential sources and why the investigative team believed those sources to be reliable. *See id.* Paragraph 100 (including all subparts) of the affidavit further outlines the documents and other evidence agents expected to find if authorized to conduct the search; paragraph 100 also explains why, based on the collective experience of the investigative team, they expected to find those items.

On December 10, 2015, Judge Mummert issued a search warrant finding probable cause to search Reno's residence and to seize a number of documents and other objects such as proceeds of illegal drug sales, records of such proceeds, address and telephone numbers of drug trafficking associates, computer equipment, media storage, firearms and ammunition, wire transfer records and receipts, packaging materials, tax forms, drug paraphernalia, and so on. *See id*. Agents executed the search warrant on December 17, 2015, seized documents and other items, and submitted a return listing the items seized. *See id.*

## III. CONCLUSIONS OF LAW

### A. Motion to Suppress Evidence (Doc. 318)

At the time of the evidentiary hearing, Reno sought suppression of (i) records and location information for a cellular telephone registered to Reno obtained via an April 3, 2015 order; (ii) recordings from a monitored pole camera installed near Reno's home at 1311 Ringo; (iii) electronic identifying numbers of any cellular telephones used by Reno obtained through a September 8, 2015, search warrant for a cell-site simulator; and (iv) evidence seized pursuant to a December 10, 2015 search warrant executed at Defendant's home at 1311 Ringo in Mexico, Missouri. (Doc. 318).[2]

#### 1. Evidence Seized Pursuant to the PLI Warrant and the Cell-Site Warrant Should Not Be Suppressed

Reno seeks to suppress evidence and information seized pursuant to the April 3, 2015 PLI Warrant and the September 8, 2015 Cell-Site Warrant. The Fourth Amendment requires that search warrants be based on probable cause. *United States v. Montes-Medina,* 570 F.3d 1052, 1059 (8th Cir. 2009). Probable cause exists when "there are sufficient facts to justify the belief by a prudent person that contraband or evidence of a crime will be found in the place to be searched." *United States v. Bieri*, 21 F.3d 811, 815 (8th Cir. 1994); *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "Probable cause requires only a showing of fair probability, not hard certainties." *United States v. Tripp*, 370 F. App'x. 753, 757 (8th Cir. 2010) (quoting *United States v. Hudspeth*, 525 F.3d 667, 676 (8th Cir. 2008)).

Affidavits for search warrants are reviewed using the "totality-of-the-circumstances" analysis. *Gates*, 462 U.S. at 238. The task of the issuing judge is to make "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis

---

[2] As set out above, although Reno's written suppression motion sought suppression of other items such as items seized from the Audrain County traffic stop and from 117 South Olive, at the start of the evidentiary hearing, the United States advised that it would not seek to admit any evidence or statements obtained during the traffic stop in Audrain County on March 15, 2015 and Reno conceded that he lacked standing to challenge any pole camera recordings or other evidence seized from the business at 117 South Olive Street. As such this Report and Recommendation does not address any of those issues.

of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the [judge] had a substantial basis for . . . concluding that probable cause existed." *Id.* at 238-39 (internal quotation marks omitted); *see also Massachusetts v. Upton*, 466 U.S. 727, 728 (1984). When the judge relied solely on the affidavit presented to him or her, "only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." *United States v. Gladney*, 48 F.3d 309, 312 (8th Cir. 1995) (quoting *United States v. Leichtling*, 684 F.2d 553, 555 (8th Cir. 1982)). Affidavits must be read in "a commonsense and realistic fashion." *United States v. Caldwell*, 864 F.2d 71, 74 (8th Cir. 1988) (citation omitted). "Deference is accorded an issuing [judge's] probable cause determination . . . ." *United States v. Brown*, 584 F.2d 252, 256 (8th Cir. 1978).

In this case, Reno's motion to suppress fails to articulate any basis why information and evidence seized pursuant to these warrants should be suppressed. A review of both warrant applications and supporting affidavits reveals that the warrants were properly issued and supported by probable cause. As such, Reno's motion to suppress evidence seized pursuant to the PLI Warrant and Cell-Site Warrant should be denied.

## 2. *Agents' Extended Use of a Warrantless Pole Camera at 1311 Ringo Did Not Violate the Fourth Amendment*

Reno contends investigators' warrantless use of a pole camera to surveil his residence violated the Fourth Amendment. Reno cites *United States v. Jones,* 565 U.S. 400 (2012), in support of this contention. As the United States correctly notes, *Jones* did not involve a warrantless pole camera; it involved the warrantless installation and use of a GPS tracking device on an automobile. *Id. Jones* is nevertheless instructive, because the majority opinion clarified that in determining whether a search by law enforcement violates the Fourth Amendment, courts must consider (1) whether law enforcement violated the Fourth Amendment by committing a physical trespass onto private property and (2) whether, under the "reasonable-expectation-of-privacy test" articulated in *Katz v. United States*, 389 U.S. 347, 361 (1967),

law enforcement violated an individual's reasonable expectation of privacy. *Id.* at 408-09. Under *Katz,* A legitimate expectation of privacy exists when (1) an individual has a subjective (actual) expectation of privacy and (2) the individual's expectation of privacy "is one that society is prepared to recognize as reasonable." *Katz*, 389 U.S. at 361 (Harlan, J., concurring).

*Jones* is also instructive because although *Jones* was ultimately decided under the first prong— i.e., a Fourth Amendment violation via trespass— two concurring opinions, in which five Justices joined, highlighted unique privacy issues under the *Katz* reasonable-expectation-of-privacy test that can arise from law enforcement's use of evolving technology to conduct electronic surveillance. In one concurring opinion, Justice Sotomayor noted electronic surveillance such as GPS monitoring "generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations." *Id.* at 415 (Sotomayor, J., concurring). In a separate concurring opinion, Justice Alito recognized that "in the pre-computer age, the greatest protections of privacy were neither constitutional nor statutory, but practical." *Id.* at 429 (Alito, J., concurring) (observing that the kind of surveillance law enforcement was able to accomplish with GPS tracking would have been difficult and costly using traditional surveillance and "[o]nly an investigation of unusual importance could have justified such an expenditure of law enforcement resources."). In the post-computer era, however, new technology makes long-term monitoring relatively easy and cheap. *Id.* As such, new technology, like GPS tracking, enhances the ability of law enforcement to fight and prevent crime, but at the same time permits law enforcement to impinge on privacy in ways society would not have expected. *Id.* at 429-30. As Justice Alito reasoned, "society's expectation has been that law enforcement agents and others would not—and indeed, in the main, simply could not—secretly monitor and catalogue every single movement of an individual's car for a very long period." *Id.* at 430.

Both concurring opinions concluded that "the lengthy monitoring that occurred in [*Jones*] constituted a search under the Fourth Amendment" for which a warrant was required. *Id.* at 431. *See also id.* at 415 (Sotomayor, J., concurring) ("As Justice Alito incisively observes, the same technological

advances that have made possible nontrespassory surveillance techniques will also affect the *Katz* test by shaping the evolution of privacy expectations. [. . .] Under that rubric, I agree with Justice Alito that, at the very least, 'longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy.'"). By implication, the concurring opinions conclude that, in addition to the physical trespass Fourth Amendment violation espoused in the majority opinion, the facts in *Jones* also may have constituted a Fourth Amendment violation under the *Katz* reasonable-expectation-of-privacy test.

Post-*Jones,* courts have applied the reasoning from the concurring opinions in *Jones* when deciding whether the warrantless use of pole cameras, like the one at issue in this case, violated the Fourth Amendment under the *Katz* reasonable-expectation-of-privacy test. The parties do not cite, and I have not found, any Eighth Circuit decisions on point. It appears that post-*Jones* the Sixth Circuit may be the only Circuit Court of Appeals to have considered the issue in *United States v. Houston*, 813 F.3d 282, 285 (6th Cir. 2016). In *Houston*, law enforcement installed cameras on top of a public utility pole that recorded the defendant's property for ten weeks. 813 F.3d at 285. As in this case, the defendant challenged the video evidence because the camera was installed without a warrant. *Id.* at 286. In finding no Fourth Amendment violation, the court concluded Houston had no actual or subjective expectation of privacy because the video surveillance only captured the same view that a passerby would have on public roads. *Id.* at 288. In so holding, the court rejected Houston's argument that the presence of blue tarps and foliage obstructing a clear view of his home by passersby gave rise to an actual subjective expectation of privacy. *Id.* The court noted that the Supreme Court had previously upheld warrantless aerial observations of curtilage, finding that "'the mere fact that an individual has taken measures to restrict some views of his activities' does not 'preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible.'" *Houston*, 813 F.3d at 288 (quoting *California v. Ciraolo*, 476 U.S. 207, 213 (1986)).  The court further reasoned that agents could have been stationed round-the-clock to monitor the property from the public road, and thus their use of technology to accomplish what they could have accomplished without technology did not make the surveillance unconstitutional. *Id.*

The Sixth Circuit also considered the concerns expressed by the Justices in the concurring opinions in *Jones*, including the length of time the pole camera surveillance had lasted. *Id.* at 289. The Sixth Circuit distinguished the nature of the surveillance conducted via the stationery pole camera used in *Houston* from the nature of the surveillance conducted via the GPS tracker in *Jones*. *Id.* at 289-90. Specifically, the *Houston* court reasoned that surveillance using a stationary pole camera was "not so comprehensive as to monitor Houston's every move; instead, the camera was stationary and only recorded activities outdoors on the [property.]" *Id.* The court in *Houston* further reasoned that "[b]ecause the camera did not track Houston's movements away from the [property], the camera did not do what Justice Sotomayor expressed concern about with respect to GPS tracking: 'generate[ ] a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations.'" *Id.* at 290 (quoting *Jones*, 565 U.S. at 414 (Sotomayor, J., concurring)). Although the *Houston* court did not say so explicitly, it appeared to hold that even if Houston had a subjective or actual expectation of privacy in the areas captured by the pole camera, because law enforcement used a stationary pole camera trained only on those parts of the residence that are subject to public view, such an expectation by Houston is not one that "society is prepared to recognize as reasonable." *Katz*, 389 U.S. at 361.

Other courts, such as the district courts whose decisions are cited in Reno's Motion to Suppress, have expressed significant concerns about law enforcement's warrantless use of pole cameras for extended periods but, for various reasons, have declined to order suppression. *See* Doc. 318, at p. 7 (citing *United States v. Garcia-Gonzalez*, No. CR 14-10296-LTS, 2015 WL 5145537, at *9 (D. Mass. Sept. 1, 2015) (denying suppression based on existing circuit authority); *United States v. Houston*, 965 F. Supp. 2d 855, 871-72 (E.D. Tenn. 2013) (concluding that ten weeks of use of a pole camera was unreasonable, but denying suppression on other grounds); *United States v. Wymer*, 40 F. Supp. 3d 933, 942 (N.D. Ohio 2014) (denying suppression based on existing circuit authority, but noting "[g]iven the uniquely intrusive nature of continuous and prolonged video surveillance, and the ease with it permits law enforcement to

evade ordinary checks on their ability to observe the daily activities of citizens, the far better practice is to apply for a warrant.")); *see also United States v. Stefanyuk*, 4:17CR40042 KES, 2018 WL 3235569, *4-*8 (D. S.D. June 15, 2018) (rejecting the analysis in the Sixth Circuit decision in *United States v. Houston*, 813 F.3d 282 (6th Cir. 2016), as "too facile" as it "fails to recognize that a pole camera in a very real sense enhances police officers' senses—it can zoom in and pan, it can stay awake and alert for 24 hours a day without respite, it costs next to nothing, and it allows data to be stored indefinitely, to be replayed again and again in the future, allowing mining of ever-more-detailed information" but denying suppression  because defendant did not have an actual or subjective expectation of privacy in the areas surveilled).

At least one district court has applied the principles articulated in the *Jones* concurring opinions and subsequent cases to suppress evidence obtained from a pole camera. In *United States v. Vargas*, law enforcement officers surveilled the defendant's rural eastern Washington home with a pole camera which continuously recorded activity in the front yard of the defendant's property for more than six weeks. No. CR-13-6025-EFS (E.D. Wash. Dec. 15, 2014), ECF No. 106, Order Granting Defendant's Motion to Suppress at 1, available at https://www.pacer.gov. The camera was installed on a utility pole over 100 yards away and had panning and zooming capabilities which could be used on the live feed, the live feed could be viewed remotely, and images could be transmitted to law enforcement computers. *Id.* at 5-6. Invoking *Jones* and analyzing under the *Katz* "reasonable-expectation-of-privacy approach," the court ruled that, without a warrant, such continuous use of a concealed camera did not pass constitutional muster because "society expects that law enforcement's continuous and covert video observation and recording of an individual's front yard must be judicially approved, and Mr. Vargas' conduct during the six weeks that his front yard was covertly observed and recorded indicates that he expected not to have his front yard covertly observed and recorded on a continuous basis by law enforcement." *Id.* at 1-2, 12-13.

Central to the holding in *Vargas* was the court's determination that Vargas had a subjective (actual) expectation of privacy. The court appeared to give particular weight to the fact that Vargas' home was

located in a rural area and Vargas appeared to have taken measures to ensure a high degree of privacy by, for example, having a fenced in yard, a gated driveway, and shrubs that shielded his property from public view. *Id.* at 15, 26. The court considered Vargas' conduct while under surveillance, including the fact that he (or his guests) openly urinated on his fenced-in property, as further evidence that he had a subjective expectation that activity on his property would be private. *Id.* at 15-16. In concluding a warrant was required, the *Vargas* court also seemed to give significant weight to the fact that, because of where Vargas's home was situated, agents likely could not have used traditional (physical) surveillance to conduct the type of surveillance accomplished by the camera. *Id.* at 19-21. The court also emphasized the fact that the camera used to surveil Vargas' property allowed agents to remotely zoom in and pan the property. *Id.* at 21, 26.

In a recent decision, the district of South Dakota applied the analysis from *Vargas* in determining whether to suppress evidence from a warrantless pole camera. *United States v. Stefanyuk*, 4:17CR40042 KES, 2018 WL 3235569, * 4 (D. S.D. June 15, 2018), Report and Recommendation adopted, 2018 WL 3222556 (D. S.D. July 2, 2018). In *Stefanyuk*, law enforcement officers surveilled the defendant's home in suburban Sioux Falls with a pole camera that continuously recorded activity in the front yard of the defendant's property for two weeks. *Id.* at *1-*2. The camera was installed about 15 feet off the ground in a right-of-way directly across the street from defendant's home. *Id.* at *1. The camera had panning and zooming capabilities which could be used on the live feed, the live feed could be viewed remotely, and images could be transmitted to law enforcement computers. *Id.* at *2. Recorded footage could be reviewed with rewind and fast forward capabilities. *Id.* at *2. The view of the camera showed only the front of the house; agents could not see into the house or on either side of the house; however, if the garage door was up, agents could see a little ways into the garage. *Id.*

Stefanyuk moved to suppress the pole camera evidence, and the parties agreed there was no binding precedent from the Eighth Circuit on the necessity of obtaining a search warrant prior to using a pole camera for surveillance. *Id.* at *3. The court considered *Jones* and subsequent cases and rejected as

"too facile" decisions such as the Sixth Circuit decision in *United States v. Houston*, 813 F.3d 282 (6th Cir. 2016), because they fail to recognize that a pole camera in a very real sense enhances police officers' senses—it can zoom in and pan, it can stay awake and alert for 24 hours a day without respite, it costs next to nothing, and it allows data to be stored indefinitely, to be replayed again and again in the future, allowing mining of ever-more-detailed information." *Stefanyuk*, 2018 WL 3235569, at *4. The court nevertheless denied suppression, appearing to find that defendant did not have an actual or subjective expectation of privacy in the areas surveilled. *Id.* at *6-*7.

In reaching this conclusion, the court in *Stefanyuk* found the analysis in *Vargas* to be "sound and well-supported," but nevertheless held that differences between the residential setting in *Vargas* and the residential setting in *Stefanyuk* compelled a different result on the question of what constitutes a reasonable expectation of privacy under *Katz. Id.* at *6. Specifically, the court noted that unlike the defendant in *Vargas,* Stefanyuk's home was in a suburban (not rural) setting, where there were many houses in close proximity to the defendant's house. *Id.* One house sat facing the front of Stefanyuk's house with an unimpeded view of his front yard, garage and front door; another house sat immediately to the south of the defendant's house. *Id.* Also setting Stefanyuk's case apart from *Vargas* was the use of traditional means of surveillance by agents investigating Stefanyuk. *Id.* at *7. Based on those facts, the court concluded that unlike the defendant in *Vargas*, "literally every time Mr. Stefanyuk exited his home, he had to expect a passerby or neighbor might view him." *Id.* at *6. As such, the court in *Stefanyuk* appears to have concluded that Stefanyuk did not have an actual or subjective privacy interest in the area surveilled, not merely because it was exposed to public view but because of where his home was situated. *Id.* at *6-*7.[3]

---

[3] A second factor, which appears to have been central to the court's holding, was that Stefanyuk was serving a term of federal supervised release during the time of the pole camera surveillance. Thus, the court concluded he had a diminished expectation of privacy and any subjective expectation of privacy he may have had in his comings and goings from his home would have been an expectation society is not "willing to recognize as legitimate given Mr. Stefanyuk's status as a federal supervisee." *Id.* at *8.

Applying the foregoing legal principles to the factual findings in this case, I find no Fourth Amendment violation. First, this case does not involve the first prong of the *Jones* analysis, because it is undisputed that there was no physical trespass by law enforcement onto Reno's property. As such, Reno cannot show, and does not assert, a Fourth Amendment violation under the *Jones* trespass approach.

Nor do I find a Fourth Amendment violation under the *Katz* reasonable-expectation-of-privacy test. Reno's contention appears to be that he had a right to be free from continuous 24-hour-a-day, seven days-a-week recorded surveillance of the driveway in the front of his home. Here, as in *Houston* and in *Stefanyuk*, the area of Reno's home surveilled by law enforcement—Reno's driveway—was readily accessible and visible to the public and Reno's next door neighbor. Like the home at issue in *Stefanyuk,* Reno's home was located in a suburban, not a rural, neighborhood. The photograph presented at the evidentiary hearing made clear that, given the proximity of Reno's home to the homes of his neighbors (both next door and across the street), Reno had a diminished expectation that activities conducted in or about his driveway (the area surveilled by the pole camera at issue) would be private. Given the proximity of Reno's home to the home of his next door neighbor, which Agent Lawyer estimated was a distance of only approximately 50 feet, Reno could not have reasonably expected that the identity of cars pulling up on his driveway would be private. There was no fence or shrubbery separating Reno's yard from that of his neighbor's yard, and passers-by on the street (one of whom is depicted on the photograph) would have a clear view of the area surveilled by the camera. Indeed, like the defendant in *Stefanyuk,* "literally every time Mr. [Reno] exited his home, he had to expect a passerby or neighbor might view him." *Stefanyuk,* 2018 WL 3235569 at *6. For these reasons, Reno has failed to establish that he meets the first prong of *Katz. Katz*, 389 U.S. at 361 (Harlan, J., concurring) (finding that a legitimate expectation of privacy exists when (1) an individual has a subjective (actual) expectation of privacy and (2) the individual's expectation of privacy "is one that society is prepared to recognize as reasonable).

Admittedly, the question of whether the type of surveillance used in this case is one that society would not expect law enforcement to use without judicial approval is far more difficult to answer given

- 22 -

the current state of the law. Although compelling, the potential Fourth Amendment concerns of long-term surveillance aided by ever-advancing technology articulated in the *Jones* concurring opinions did not undergird the ultimate holding by the majority opinion in *Jones*. Rather, the majority opinion identified an additional mode of analysis (inapplicable in this case) and reserved for another day the question of whether electronic surveillance of extensive duration violates the Fourth Amendment in the absence of a warrant. *See Jones*, 565 U.S. at 411-12 ("[U]nlike the concurrence, which would make *Katz* the *exclusive* test, we do not make trespass the exclusive test. Situations involving merely the transmission of electronic signals without trespass would *remain* subject to Katz analysis. . . . It may be that achieving the same result through electronic means, without an accompanying trespass, is an unconstitutional invasion of privacy, but the present case does not require us to answer that question.") (emphasis in original). And, as discussed above, following *Jones,* courts that have subsequently tackled concerns of long-term surveillance arising from pole camera use have been reluctant to suppress warrantless pole camera evidence absent clear facts such as those in *Vargas* suggesting the government had to invade an individual's privacy to conduct pole camera surveillance.

Notwithstanding the uncertain state of the law, even if Reno met the first prong of *Katz*, it is doubtful he would meet the second prong given the facts of this case. Unlike the situation in *Vargas*, in which agents could not have obtained the information sought without covert pole camera surveillance, the agents in this case could have, and indeed did, obtain evidence from more traditional physical surveillance of Reno's residence. For example, Agent Lawyer's affidavit submitted in support of the PLI Warrant made clear that at least one drug task force officer personally observed extensive "short stay traffic" at Reno's residence that was consistent with drug trafficking before the pole camera was installed. As such, the "view" captured by the pole camera in this case is much more akin to the type of plain-view curtilage observations that courts have consistently held fall outside of the purview of a Fourth Amendment search. *See Vargas,* No. CR-13-6025-EFS at 19-20 (discussing cases).

To be sure, agents' use of an internet-based pole camera gave them the benefit of a digital eye that was continuous and unblinking for 24 hours a day, seven days a week, and that could record Reno's comings and goings and the comings of goings of others for a six-week period. This allowed for a level of surveillance that could not realistically have been accomplished by traditional means. On the other hand, however, evidence that the camera in this case either lacked surveillance enhancing features such as the ability to zoom in or pan (or those features were not used) and evidence that the camera appears to have been trained exclusively on areas that could have been seen unaided by a neighbor or a passerby suggests a level of intrusiveness well below that possible through other electronic surveillance such as the GPS tracker which can track movement away from the residence. As the court in *Houston* pointed out, the level of intrusiveness resulting from a continuously recording stationery pole camera trained exclusively on an area accessible to the public seems to be dramatically different from the level of intrusiveness resulting from the use of other types of surveillance like a GPS tracker that could, over time, "generate[ ] a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations." *Houston,* 813 F.3d at 290 (citing *Jones*, 565 U.S. at 414 (Sotomayor, J., concurring)).[4]

In sum, for the reasons set out above, Reno could not have had an actual expectation that activity on his driveway would be private, and I am unable to conclude that, based solely on the continuous nature of the pole camera surveillance used by agents in this case, agents' use of the pole camera without a warrant violated the Fourth Amendment. For all of these reasons, Reno's motion to suppress pole camera evidence should be denied.

_____

[4] Of course, even when a covert pole camera is trained on an otherwise public area near a residence, if it is in use long enough, one can imagine any number of scenarios in which activity not intended for public consumption might be captured. For that reason, perhaps, as other courts have suggested, the better course for agents intending to use a pole camera in a residential area for any extended period would be to obtain a search warrant.

### 3. *Evidence Seized Pursuant to the December 10, 2015 Search Warrant Should Not Be Suppressed*

Based on the foregoing factual findings, the undersigned concludes the December 2015 search of Reno's residence and the seizure of documents and other physical evidence associated with drug distribution was lawful, because the search warrant affidavit provided a substantial basis on which Judge Mummert could find probable cause for the search and because the good faith exception permitted agents to rely on the warrant even if the warrant was not supported by probable cause.

#### i.  The warrant was supported by probable cause

The search warrant affidavit details a long-term investigation by the DEA into the Robert Reno drug trafficking organization ("DTO"). At the time of the search warrant, the investigation was concluding. As such, agents had access to, and could rely upon, information obtained during the investigation, including interviews of numerous cooperating individuals, confidential sources, controlled drug purchases, extensive surveillance, and Title III intercepts of telephones used by Reno and other members of the DTO. The affidavit included and relied upon information gleaned from intercepted communications between Reno and others, which appear to involve the sale and distribution of methamphetamines. The affidavit also described detailed first-hand accounts from multiple confidential sources, concerned citizens, and sources of information linking Reno and his residence to drug trafficking activities. Information provided by these human sources was consistent with intercepted communications. In sum, given all the circumstances set forth in the affidavit, including the veracity and basis of knowledge of persons supplying hearsay information, Judge Mummert had a "substantial basis for . . . concluding that probable cause existed." *Gates*, 462 U.S. at 238-39.

Defendant's contention that the warrant lacked probable cause because it relied upon stale information is unavailing. The Eighth Circuit has declined to draw any bright line that would require a court reviewing a probable cause determination to categorically define information obtained outside of a particular time frame as "stale." Instead, "[t]ime factors must be examined in the context of a specific case

and the nature of the crime under investigation." *United States v. Formaro,* 152 F.3d 768, 771 (8th Cir. 1998) (quoting *United States v. Koelling,* 992 F.2d 817, 822 (8th Cir. 1993)). "[W]here continuing criminal activity is suspected, the passage of time is less significant." *Id.* This is particularly true where, as in this case, "investigations of ongoing narcotics operations, intervals of weeks or months between the last described act and the application for a warrant [do] not necessarily make the information stale." *Id.* (quotation marks omitted). Given the extensive nature of the investigation here, any brief interval that elapsed between the last of the wire intercepts reflected in the warrant affidavit and the date investigators applied for a warrant is not sufficient to render the information in the search warrant affidavit stale.

Defendant's contention that the CS and other informants were not reliable is also without merit. "When an affidavit is based in substantial part on information from an informant, the informant's reliability, veracity, and basis of knowledge are relevant considerations—but not independent, essential elements—in finding probable cause." *United States v. Revivich*, 793 F.2d 957, 959 (8th Cir. 1986) (citing *Gates*, 462 U.S. at 230, and *United States v. Ross*, 713 F.2d 389, 393 (8th Cir. 1983)); *see also United States v. McAtee*, 481 F.3d 1099, 1102 (8th Cir. 2007). "It is well settled that the statements of a reliable informant can provide, by themselves, a sufficient basis for the issuance of a warrant." *United States v. Pressley*, 978 F.2d 1026, 1027 (8th Cir. 1992) (citing *McCray v. Illinois*, 386 U.S. 300 (1967)).

Under Eighth Circuit precedent, there are several factors the court should consider in determining whether information is reliable. For example, "[a]n informant's tip can be sufficient to establish probable cause if the informant 'has a track record of supplying reliable information' or if the tip 'is corroborated by independent evidence.'" *United States v. Gabrio*, 295 F.3d 880, 883 (8th Cir. 2002) (quoting *United States v. Williams*, 10 F.3d 590, 593 (8th Cir. 1993)). Reliability may be found on the basis that past tips have led to seizures of contraband or other evidence. *Formaro*, 152 F.3d at 770; *Gladney*, 48 F.3d at 313; *Williams*, 10 F.3d at 594. The Eighth Circuit has also noted that "there are indicia of reliability in 'the richness and detail of a first-hand observation.'" *United States v. Buchanan*, 574 F.3d 554, 561 (8th Cir. 2009) (quoting *United States v. Jackson*, 898 F.2d 79, 81 (8th Cir. 1990)); *see also Gates*, 462 U.S. at 234

(finding that an informant's "explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand, entitles his tip to greater weight"); *Williams*, 10 F.3d at 594 (noting that source's information was "based on the informant's first-hand observations, not merely from rumor or innuendo"). Furthermore, "'[s]tatements against the penal interest of an informant typically carry considerable weight' in establishing reliability." *Buchanan,* 574 F.3d at 561-62 (quoting *United States v. Tyler*, 238 F.3d 1036, 1039 (8th Cir. 2001)). "The circumstances of personal questioning may also enhance reliability and credibility." *Id.* at 562; *see also United States v. Robertson*, 39 F.3d 891, 893 (8th Cir. 1994) (stating the reliability of a tip is enhanced when a law enforcement officer meets personally with the informant to assess his credibility). Finally, "[p]robable cause can be established when information from one informant is consistent with that of a second, independent informant." *Buchanan*, 574 F.3d at 562. "Where the informant's information is at least partially corroborated, attacks upon credibility and reliability are not crucial to the findings of probable cause." *United States v. Humphreys*, 982 F.2d 254, 259 (8th Cir. 1992).

As the factual findings demonstrate, the affidavit outlines the background of the confidential sources referenced in the affidavit; describes how the investigative team corroborated information provided by the confidential sources; and explains why the investigative team believed those sources to be reliable. The reliability of the CS was further enhanced by first-hand accounts; intercepted communications and corroboration by multiple sources of the same information. In sum, the search warrant affidavit more than amply established the informants' reliability. As such, based on the totality of the circumstances presented in the search warrant affidavit, Judge Mummert had a substantial basis for concluding that there was probable cause for the search of Reno's residence.

ii.   The good faith exception applies

Even if the search warrant affidavit somehow fell short of supplying probable cause, the good faith exception under *United States v. Leon*, 468 U.S. 897, 922 (1984), applies. In *Leon*, the Supreme Court held that evidence obtained in violation of the Fourth Amendment by officers acting in objectively

reasonable reliance on the search warrant issued by a neutral and detached judge need not be excluded as a matter of law. *Id.* "In the absence of an allegation that the [issuing judge] abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." *Id.* at 926.

Nothing in Reno's written submissions even hints that the agents involved in the preparation of the search warrant were dishonest in preparing the affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause. In addition, nothing in Reno's submissions or the evidence of record suggests that the issuing judge, Judge Mummert, abandoned his detached and neutral role. In sum, neither Reno's written submissions nor evidence adduced at the hearing provide any basis for concluding that the good faith exception does not apply in this case. Because Reno's assertions fall far short of showing either that the issuing judge abandoned his detached and neutral role or that the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause, the good faith exception applies, and suppression is inappropriate.

For all of the foregoing reasons, Defendant's motion to suppress physical evidence should be denied.

### B. Motion to Suppress Electronic Surveillance Evidence (Doc. 317)

Reno argues that all evidence obtained by means of the court authorized interceptions must be suppressed because the affidavits of Agent Lawyer submitted in support of the authorization failed to satisfy the necessity requirement set out in 18 U.S.C. §§ 2518(1)(c) & (3)(c) and failed to adhere to minimization requirements. Other than necessity and minimization, Reno does not challenge the propriety of the court authorized interceptions.

## 1.   *Necessity*

Under § 2518(1)(c), each application for a wiretap authorization must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." *See United States v. Turner,* 781 F.3d 374, 382 (8th Cir. 2015) (quoting 18 U.S.C. § 2518(1)(c)). Section 2518(3)(c) similarly requires that in issuing a wiretap authorization order, the district court must determine whether "normal investigative procedures have been tried and have failed or reasonably appear unlikely to succeed if tried or to be too dangerous." *See United States v. West,* 589 F.3d 936, 939 (8th Cir. 2009) (quoting 18 U.S.C. § 2518(1)(c)). Together, these sections make up the necessity requirement for granting an order to receive wire intercepts from a phone.

It is well established that although wiretaps should not be "routinely used as the initial step in an investigation," the necessity requirement "does not require that law enforcement exhaust all possible techniques before applying for a wiretap." *Turner,* 781 F.3d at 383 (quotation marks omitted). "If law enforcement officers are able to establish that conventional investigatory techniques have not been successful in exposing the full extent of the conspiracy and the identity of each co-conspirator, the necessity requirement is satisfied." *Id.* at 382 (quoting *United States v. West*, 589 F.3d 936, 939 (8th Cir. 2009)). Indeed, the Eighth Circuit has interpreted the necessity requirement to "restrict wiretaps to situations in which they are necessary as well as reasonable, but not to require the government to show the exhaustion of specific or all possible investigative techniques before wiretap orders could be issued." *United States v. Thompson,* 690 F.3d 977, 986 (8th Cir. 2012) (internal quotations omitted) (quoting *United States v. Daly,* 535 F.2d 434, 438 (8th Cir. 1976)). Moreover, whether the statutory requirement is met is a question of fact to be determined by the issuing judge "in a commonsense manner." *Id.*

Here, the undersigned previously heard testimony and received evidence regarding the necessity requirement in connection with a suppression motion filed by Reno's co-defendant Douglas Druger. The evidence consisted of testimony by Agent Lawyer and the same Title III wiretap application, affidavit and

orders at issue in this case. On May 9, 2017, the undersigned entered a Report and Recommendation recommending that Druger's motion to suppress electronic surveillance evidence be denied. (Doc. 137). That Report and Recommendation was subsequently adopted and sustained by United States District Judge Catherine Perry. (Doc. 149). At the evidentiary hearing in this case, the parties agreed and stipulated that the evidence regarding the issue of necessity is identical to the evidence presented in connection with the Druger motion. As such, I hereby adopt and incorporate by this reference the findings and conclusions of law in my Report and Recommendation entered on May 9, 2017 and conclude, for the same reasons set out in the earlier Druger Report and Recommendation, that Defendant Reno's motion to suppress electronic surveillance evidence on necessity grounds should be denied.

### 2. Minimization

Title 18, United States Code, Section 2518(5) requires that court-authorized electronic surveillance "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception." "Section 2518 'does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to minimize the interception of such conversations.'" *United States v. West*, 589 F.3d 936, 939 (8th Cir. 2009) (quoting *Scott v. United States*, 436 U.S. 128 (1978)).

Based on the foregoing factual findings and the evidence of record in this case, the minimization requirements of section 2518(f) were met. Agent Lawyer credibly testified that law enforcement personnel involved in monitoring conversations, pursuant to the court-ordered electronic surveillance, were instructed via letter and in person, prior to beginning their monitoring, as to the types of conversations to be intercepted, the types to be minimized, and methods of doing so. *See* Govt. Ex. 6. Each of the agents who monitored the wire in this case were required to read this letter and sign, indicating that they understood the terms and conditions of the judge's order. There was also a face-to-face meeting between the agents and the government attorney who signed the affidavit, at which the minimization requirements were further explained.

Agent Lawyer testified that targets of this investigation and their associates used coded or ambiguous language. As such, it is entirely possible investigators monitored some calls that may have ultimately turned out to be non-pertinent. Finally, the United States presented nine separate 10-day reports that were filed with the United States District Court Judges who authorized the interceptions. Those reports allowed the issuing Judge to specifically review the calls being monitored and determine if any remedies need to be employed to avoid unnecessary intrusion.

In sum, notwithstanding the defendant's suggestions to the contrary, there is no evidence of record that there were non-pertinent or privileged calls which should have been minimized but were not.

**IV.  CONCLUSION**

For all of the foregoing reasons, Defendant Reno's motions to suppress evidence should be denied.


SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 7TH day of November, 2018.

- 31 -